[Cite as *State v. Collmar*, 2013-Ohio-1766.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.    26496 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOSHUA N. COLLMAR, SR. | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 11 11 3121 |

DECISION AND JOURNAL ENTRY

Dated: May 1, 2013

CARR, Presiding Judge.

{¶1}    Appellant Joshua Collmar, Sr. appeals his conviction in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}    Collmar was indicted on one count of felonious assault, one count of felony domestic violence, and one count of misdemeanor domestic violence.  He pleaded not guilty to the charges at arraignment.

{¶3}    The State and Collmar engaged in Crim.R. 11 plea negotiations and the parties appeared to have reached an agreement contingent on his qualifying for participation in the domestic violence court's intensive probation program.  The court referred Collmar for screening and scheduled a later pretrial at which the parties would discuss his qualification for participation in the program.  At a subsequent pretrial, Collmar's attorney informed the trial court that Collmar had rejected the terms of the plea agreement.  The record does not contain any

information regarding the results of Collmar's screening or whether or not he was qualified to participate in the domestic violence court's intensive probation program.

{¶4} The matter proceeded to trial. At the conclusion of trial, the jury found Collmar not guilty of felonious assault, but guilty of both counts of domestic violence. The trial court merged the misdemeanor count into the felony and sentenced Collmar to three years in prison. Collmar appealed, raising three assignments of error for review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY DENYING MR. COLLMAR'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL AS THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTIONS.

{¶5} Collmar argues that the trial court erred by overruling his motion for judgment of acquittal because the State presented insufficient evidence to support the charge of domestic violence. This Court disagrees.

{¶6} Crim.R. 29 provides, in relevant part:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Galloway*, 9th Dist. No. 19752, 2001 WL 81257 (Jan. 31, 2001) quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶7}** The test for sufficiency requires a determination of whether the State has met its burden of production at trial. *State v. Walker*, 9th Dist. No. 20559, 2001 WL 1581570 (Dec. 12, 2001); *see, also*, *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

**{¶8}** Collmar was convicted of domestic violence in violation of R.C. 2919.25(A) which states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." The crime was charged as a felony of the third degree based on the allegation that Collmar had previously been convicted of two or more offenses of domestic violence. R.C. 2919.25(D)(4).

**{¶9}** "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Physical harm to persons" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

**{¶10}** R.C. 2919.25(F)(1) defines "family or household member" as

(a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or a former spouse of the offender;

(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;

(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.

(b) The natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent.

**{¶11}** A "person living as a spouse" includes "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the

offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

{¶12} Mark Pazdernik, a paramedic with the Akron Fire Department, testified that he responded in the middle of the night on October 21, 2011, to Heather Radcliff's home after she called 911. The 911 call was played for the jury. Ms. Radcliff told the operator that three people, including her ex-boyfriend, came to her house and beat her. Mr. Pazdernik testified that he took the patient's history and that she reported that a man punched her in the face and injured her wrist. He noted swelling to Ms. Radcliff's lip and wrist. He testified that, although the victim admitted that she had been drinking, she was alert during his assessment.

{¶13} Dr. J. Eric Blum, a radiologist, testified that he interpreted x-rays of Ms. Radcliff's wrist on October 21, 2011. He testified that the x-rays indicated a spiral fracture to her right wrist, which he described as an uncommon type of wrist fracture.

{¶14} The victim Heather Radcliff testified only after being granted immunity because she knew that her prior statements would not be consistent with her testimony. She testified that she and Collmar dated and lived together for approximately three years in two locations during the past four years. She testified that she and Collmar had an argument around 2:00 a.m. on October 21, 2011; that a couple other people were at her house at the time; and that her arm somehow became fractured. While she admitted that Collmar may have been upset that she was dating a man of another race, she was adamant that she could not recall what happened that morning because she was intoxicated at that time and the incident occurred seven months earlier. Ms. Radcliff remembered that she called 911 after Collmar left.

**{¶15}** The State played a recording of the victim's 911 call. Ms. Radcliff reported that she got "beat up" after three people (two men and one woman), including her ex-boyfriend, came to her home in the middle of the night. She reported that her wrist was probably broken.

**{¶16}** Ms. Radcliff authenticated pictures taken at her home the morning of the incident, as well as pictures of her injuries. Her home was in disarray, with furniture tipped, cushions askew on the floor, a picture knocked off the wall, and other items out of place. Pictures of the victim showed a cut on her lip, marks/bruises on her neck, and her arm in a splint placed by the paramedic. The victim's face looked as though she had been crying, and she admitted she had been.

**{¶17}** The victim testified that she loved Collmar and always will. She testified that she knew that he had prior convictions for domestic violence. She admitted that she sought and obtained a civil protection order after he was arrested out of fear that he would be mad about spending time in jail.

**{¶18}** Ms. Radcliff testified that she believed that the police officers who responded to her home on October 21, 2011, did not sign charges against Collmar because she had been drinking. She did not remember later talking with the police legal advisor and telling him that she was upset that the police were not pursuing the matter. The victim did remember subsequently speaking with Sergeant Lietke of the Akron Police Department, although she could not remember what she told him.

**{¶19}** The State played a recording of Ms. Radcliff's conversation with Sgt. Lietke at the police station. She reported to him that she heard someone on her front steps around 2:00 a.m. on October 21, 2011. She reported that Collmar and two other people entered her home. Although she said that she and Collmar had lived together for close to four years, as recently as

one-and-a-half to two years ago, she reported that they had been separated for seven or eight months. Ms. Radcliff reported to Sgt. Lietke that Collmar began calling her a profane, racially charged name, that he "flipped out," and that he punched her in the face about five times and choked her on the floor. She reported that, at some point during the assault, her arm got broken. Ms. Radcliff told the sergeant that Collmar flipped things in her home upside down. The victim reported that Collmar then took her cell phone to prevent her from calling the police. She reported prior instances of violence at Collmar's hands. Ms. Radcliff also told Sgt. Lietke that she tried to sign charges against Collmar at the scene but that the police officers told her to follow up with the detective bureau. She said that she contacted the detective bureau but was informed that they were too busy, and she got worried that nothing was being done. When the recording was concluded in court, Ms. Radcliff acknowledged that that was her voice on the recording. She reiterated however that, at the time of trial, she was not sure what occurred during the early morning hours of October 21, 2011.

{¶20} Officer Warren Soulsby, Jr. of the Akron Police Department testified that he responded to Ms. Radcliff's home in response to a possible domestic fight on the morning of October 21, 2011. He testified that Ms. Radcliff was crying and her hair was disheveled. The officer testified that Ms. Radcliff told him that her ex-boyfriend had assaulted her. The officer and his partner gathered additional information from the victim and evidence from the scene. The victim identified her assailant as Joshua Collmar, who appeared at her home with two other people. The victim told the officers that Collmar began arguing with her, then attacked her, threw her to the ground, and hit her multiple times. Officer Soulsby testified that the victim's home was in disarray, with furniture and other items knocked over.

{¶21} Officer Soulsby testified that the police did not sign criminal charges against Collmar at that time because Ms. Radcliff became uncooperative and asserted that she did not want the police to take any further action. The officer referred her to the prosecutor's office if she changed her mind. Officer Soulsby testified that he then called his sergeant who arrived and took photographs of the scene and Ms. Radcliff's injuries. The officer drafted an incident report. In addition, he testified that upon further investigation into the matter, he learned that Collmar had two prior convictions for domestic violence.

{¶22} Officer Todd Myers of the Akron Police Department testified that he responded to the scene with Officer Soulsby. He testified that he observed a cut on Ms. Radcliff's lip and that she was complaining that her arm hurt. Officer Myers testified that Ms. Radcliff was upset and crying as she discussed the attack by her ex-boyfriend Joshua Collmar. The officer testified that the victim reported that Collmar got angry, pushed her to the ground, and punched her in the face. The victim reported that her arm was injured as she tried to escape as he wrestled with her.

{¶23} Sgt. Scott Lietke of the Akron Police Department testified that the police legal advisor informed him that Ms. Radcliff had come to his office to speak with him about the incident with Collmar and requested further attention by the police. Sgt. Lietke reviewed the incident report and discussed the matter with the responding officers. He then called Ms. Radcliff and requested that she come to the station to speak with him. He testified that, in his vast experience with domestic violence incidents, it is common for victims to be reluctant to pursue charges against their abusers. After they spoke, the sergeant took the victim to sign charges against Collmar, who was subsequently arrested.

{¶24} Sgt. Lietke interviewed Collmar at the police station, and that recorded interview was played for the jury. Collmar informed Sgt. Lietke that he and Ms. Radcliff lived together

until six to eight months earlier. He admitted going to Ms. Radcliff's house around 2:00 a.m. on October 21, 2011, with "Vito" and Channon Adkins. When informed that Ms. Radcliff suffered a broken arm, Collmar told the sergeant that "the bitch fell at work" where she strips and pole dances. Collmar stated that Ms. Radcliff was causing trouble between him and Channon, that Ms. Radcliff "cracked" him in the head, and that, although he wanted to hit her, he simply called her a name and left. When informed of the injuries to the victim's face, Collmar stated that Ms. Radcliff probably punched herself. Collmar stated that there was nothing wrong with Ms. Radcliff's arm when he left her home and that she fell at work a few days later. Sgt. Lietke informed Collmar that it was not possible that Ms. Radcliff broke her arm at work days after Collmar left her house, because the victim was treated by paramedics for a broken arm that morning.

{¶25} Reviewing the evidence in a light most favorable to the State, this Court concludes that any rational trier of fact could have found the essential elements of the charge of domestic violence were proved beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d at paragraph two of the syllabus. The State presented evidence that Collmar and Ms. Radcliff dated and had cohabited within the past five years. Collmar informed the police that he and two other people went to Ms. Radcliff's home in the middle of the night on October 21, 2011, and that he and the victim argued. Ms. Radcliff called 911 after Collmar left and her recent injuries were observed and documented by a paramedic and police officers. Dr. Blum testified that this type of wrist injury was not common. Accordingly, the reasonable inference was that the victim did not sustain the injury merely as a result of a fall. She certainly did not sustain the injury days after it was first observed and documented. Although Ms. Radcliff claimed she did not remember what occurred during the early morning of October 21, 2011, or how she received her

injuries, she clearly articulated to the 911 operator, the paramedic, the responding police officers, and Sgt. Lietke during their interview that Collmar attacked her.  Certified copies of Collmar's prior convictions for domestic violence were admitted into evidence.  Accordingly, the State presented sufficient evidence of the crime of domestic violence.  Collmar's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶26}  Collmar argues that his conviction was against the manifest weight of the evidence.  This Court disagrees.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

> Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other.  *Thompkins*, 78 Ohio St.3d at 387.  Further when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. *Id*.

*State v. Tucker*, 9th Dist. No. 06CA0035-M, 2006-Ohio-6914, at ¶ 5.  This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction.  *Thompkins*, 78 Ohio St.3d at 387.

{¶27}  Collmar did not present a case-in-chief in his defense.

{¶28} In addition to the witnesses above, the State presented the testimony of Channon Adkins who admitted that she went to Ms. Radcliff's house around 2:00 a.m. on October 21, 2011, to look for her fiancé because she believed he was with Joshua Collmar. Ms. Adkins testified that she drove herself to Ms. Radcliff's home, went in, used the restroom, and talked a bit to Ms. Radcliff. She testified that, although she does not drink, she was drinking that night and could not remember much. Ms. Adkins testified, however, that Ms. Radcliff started arguing with and hitting Collmar, so she left. She could not remember "who started what." Ms. Radcliff, like the victim, asserted that she could not remember the details of the incident allegedly due to alcohol use at the time.

{¶29} This Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the trier of fact chose to believe certain witness' testimony over the testimony of others. *State v. Crowe*, 9th Dist. No. 04CA0098-M, 2005-Ohio-4082, ¶ 22.

{¶30} A thorough review of the record indicates that this is not the exceptional case where the evidence weighs heavily in favor of Collmar. The weight of the evidence supports the conclusion that Collmar arrived at Ms. Radcliff's home in the middle of the night, that the two argued, and that Collmar hit her in the face, "choked" her, and caused a spiral fracture in her wrist as he wrestled with the victim after throwing her to the floor. Multiple witnesses observed Ms. Radcliff's recent injuries after she called 911 immediately after Collmar left her house. Ms. Radcliff was clear and lucid on the 911 recording and during her interview with Sgt. Lietke. In both instances, she reported that her ex-boyfriend attacked and injured her. She identified Collmar as her attacker. The jury was free to believe her statements as she made them to the 911 operator and police sergeant soon after the assault, rather than her immunized testimony in court that she could not recall with any specificity the events of the morning in question. Accordingly,

Collmar's conviction for domestic violence was not against the manifest weight of the evidence. Collmar's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

> MR. COLLMAR WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT VINDICTIVELY SENTENCED HIM AFTER ALLOCUTION.

{¶31} Collmar argues that the trial court improperly imposed a vindictive sentence designed to punish him for his allocution and exercising his right to trial. This Court disagrees.

{¶32} This Court applies a two-step approach in reviewing criminal sentences: "The first step is to determine whether the sentence is contrary to law. The second step is to determine whether the court exercised proper discretion in imposing the term of imprisonment." *State v. Smith*, 9th Dist. No. 11CA0115-M, 2012-Ohio-2558, ¶ 3, citing *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, ¶ 4, 26.

{¶33} In this case, the trial court sentenced Collmar to three years in prison on his conviction for domestic violence, a felony of the third degree. Such a sentence complied with law. R.C. 2929.14(A)(3)(b). Moreover, the trial court judge asserted on the record and in the sentencing entry that she considered the purposes of felony sentencing and the statutory seriousness and recidivism factors in determining sentence. R.C. 2929.11 and 2929.12. Accordingly, Collmar's sentence was not contrary to law.

{¶34} While this Court recognizes that, while "the severity of a sentence imposed in conformity to the law rests in the sound discretion of the trial court * * * [the defendant] cannot be punished for exercising his right to trial." *State v. Mazo*, 9th Dist. No. 88CA004432, 1989 WL 72058 (June 28, 1989). The Seventh District Court of Appeals articulated the reasoning behind the law well:

A defendant should never be punished for exercising his right to trial or refusing to enter into a plea agreement. *State v. O'Dell*, 45 Ohio St.3d 140 (1989), paragraph two of the syllabus. Such a punishment would impair the constitutional right to a trial by creating a chilling effect upon a defendant's ability to exercise his constitutional right. *State v. Scalf*, 126 Ohio App.3d 614, 621 (8th Dist.1998), quoting *United States v. Stockwell*, 472 F.2d 1186, 1187 (9th Cir.1973). Accordingly, a trial court may not augment a sentence because a defendant chooses to force the government to prove his guilt, "'no matter how overwhelming the evidence of [defendant's] guilt.'" *Id.* at 620, quoting *United States v. Derrick*, 519 F.2d 1, 3 (6th Cir.1975).

But there are legitimate reasons why a trial court may sentence a defendant more harshly after a trial on the merits than it may have after a guilty plea. First, the United States Supreme Court has recognized the propriety of offering lenient sentences in exchange for a guilty plea. *See Corbitt v. New Jersey*, 439 U.S. 212, 221-224 (1978). It is proper to offer a more lenient sentence in exchange for a guilty plea because a defendant's acknowledgement of guilt has shown a willingness to assume responsibility for this conduct and has taken the first step toward rehabilitation. *Brady v. United States*, 397 U.S. 742, 753 (1970). Second, a trial court knows more details about the facts of the case, the flavor of the event, and its impact upon the victim after a trial on the merits than it would after a guilty plea. *Derrick* at 4. This "more real and accurate appraisal of the circumstances which brought the defendant to the bar of justice" will "almost inevitably * * * affect the judge's consideration of what penalty appears most appropriate." *Id*. Accordingly, the fact that the sentence imposed after trial is greater than the sentence the State offered to recommend in exchange for a guilty plea does not demonstrate that the trial court acted improperly.

*State v. Mayle*, 7th Dist. No. 04 CA 808, 2005-Ohio-1346, ¶ 45-46.

**{¶35}** In this case, the trial court judge prefaced her statements regarding sentencing by asserting:

First, I want to say the court will totally disregard any statements by the prosecutor regarding what [Collmar] was offered or the fact he put the victim through the trial. I agree with Defense Counsel [] that [the defendant] has a right to exercise his constitutional right to a trial by jury and I will not and have never penalized somebody for going to trial. I will not do that.

Accordingly, the trial court expressly asserted that it would not impose a vindictive sentence.

**{¶36}** During his allocution, Collmar thanked the judge for her time and for the jury's decision, although he maintained that he did not cause the victim's injuries "this time." He

claimed that neither he nor the victim knew what happened. He requested "some type of a program or something" because prison would just make him "meaner."

{¶37} The trial court judge based her decision to send Collmar to prison on the fact that he had prior domestic violence convictions and was on probation for those prior offenses, but failed to apply anything he might have learned. The judge further noted Collmar's failure to take responsibility for his actions, maintaining, despite the evidence of his guilt, that he did not cause Ms. Radcliff's injuries. The court noted that Collmar has repeatedly exhibited an inability to control himself, expressing outrage during his interview with Sgt. Lietke and admitting that if a "bitch" deserves to be hit, he will hit her, and "seething" and "glaring at the prosecutor when she dared to [state] her position * * *." The trial court considered the statutory factors and found that Collmar was likely to reoffend and that a sentence of fewer than three years would demean the seriousness of the offense for which Collmar refused to accept any responsibility. Under these circumstances, Collmar has not pointed to anything that would prove that the trial court sentenced him vindictively. His third assignment of error is overruled.

III.

{¶38} Collmar's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

14

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.


APPEARANCES:

LEE A. SCHAFFER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.