[Cite as *State v. Brown*, 2013-Ohio-2945.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | C.A. No. 11CA0054 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| LONNIE T. BROWN | COURT OF COMMON PLEAS COUNTY OF WAYNE, OHIO |
| Appellant | CASE No. 11-CR-0127 |

DECISION AND JOURNAL ENTRY

Dated: July 8, 2013

BAIRD, Judge.

{¶1} Appellant Lonnie Brown appeals his conviction and sentence in the Wayne County Court of Common Pleas. This Court affirms in part, reverses in part, and remands for correction of the sentencing entry.

I.

{¶2} Jamie Hout was found dead in her home. Brown was subsequently indicted on one count of aggravated murder in violation of R.C. 2903.01(B), an unclassified felony; and one count of murder in violation of R.C. 2903.02(A), an unclassified felony. The matter proceeded to trial, at the conclusion of which the jury found Brown guilty of both counts. The murder count was merged with aggravated murder as an allied offense of similar import for purposes of sentencing. The trial court sentenced Brown to life in prison without parole. It further ordered that upon completion of his prison term, Brown would be subject to a mandatory five-year period

of post-release control. Brown filed a timely appeal in which he raises six assignments of error for review.

II.

## ASSIGNMENT OF ERROR I

THERE WAS INSUFFICIENT EVIDENCE TO CONVICT LONNIE T. BROWN, JR. OF AGGRAVATED MURDER UNDER COUNT 1, AND THE CONVICTION FOR AGGRAVATED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶3} Brown argues that his conviction for aggravated murder was not supported by sufficient evidence and was against the manifest weight of the evidence. This Court disagrees.

Sufficiency of the evidence

{¶4} This Court recognizes:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Galloway*, 9th Dist. No. 19752, 2001 WL 81257, *3 (Jan. 31, 2001), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The test for sufficiency requires a determination of whether the State has met its burden of production at trial. *State v. Walker*, 9th Dist. No. 20559, 2001 WL 1581570, *2 (Dec. 12, 2001); *see also State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

{¶5} Brown was convicted of aggravated murder in violation of R.C. 2903.01(B), which states in pertinent part: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, * * * [or] aggravated burglary * * *." Pursuant to R.C.

2901.22(A): "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

{¶6} Because the State charged Brown alternatively with either aggravated burglary or kidnapping as the underlying offense, for ease of analysis, this Court limits our review of the underlying felony to aggravated burglary. The relevant portion of the aggravated burglary statute as read to the jury without objection by either party is as follows: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another[.]" R.C. 2911.11(A)(1). "Force" is satisfied by "any effort physically exerted." *State v. Snyder*, 192 Ohio App.3d 55, 2011-Ohio-175, ¶ 18-19 (9th Dist.). A criminal trespass occurs when one "without privilege to do so * * * [k]nowingly enter[s] or remain[s] on the land or premises of another[.]" R.C. 2911.21(A)(1). This Court recognizes that a privilege may be revoked and that a privilege to enter or remain upon the premises terminates immediately upon the commencement of an act of violence against the person granting the privilege. *See State v. Watson*, 9th Dist. No. 14286, 1990 WL 80550, *2 (June 13, 1990).

{¶7} Jamie Hout was found naked and dead in her home on May 5, 2011, after Brown fled from the home and yelled for a neighbor to call 911. Police arrived and secured the scene.

{¶8} Officer Michael Smith of the Orrville police department was dispatched to the scene, where he found Brown outside crying and saying that Ms. Hout was in the living room. Officer Smith found the victim lying naked in a pool of blood, with blood spatter throughout the

living room. As other law enforcement personnel arrived on scene, Officer Smith spoke with Brown outside. Brown told him that Ms. Hout had been depressed lately due to the anniversary of her mother's death. He explained that he and the victim had a father-daughter type relationship and that they spoke every day. Brown explained that he last saw Ms. Hout two days earlier at her home but that she left abruptly to "go turn tricks" for some Mexicans. When he had not heard from Ms. Hout in two days, Brown went to her home only to find both the front and back doors locked. Brown told Officer Smith that he found that odd because both doors only lock from the inside, so he knew someone was inside. Brown said he peeked in a window, saw the victim's dog in a crate, got a stool, opened a back window, and crawled inside. Brown reported that, when he saw the victim lying in the living room, he ran out the front door and yelled for someone to call 911. Brown further reported that Ms. Hout called him about a week earlier and told him that she had stolen some cocaine from some Guatemalans. Officer Smith testified that he asked Brown if he would come to the police station to make a statement away from the "chaos" of the scene, and Brown agreed. Officer Smith explained that Brown was not under arrest and that he could leave at any time. Brown voluntarily spoke with Officer Smith and Detective Joshua Hunt on May 5, 2011, and completed a written statement. At that time, Officer Smith testified that the police were focusing their investigation on the Mexicans and Guatemalans who had contact with the victim based on Brown's statements. There is no dispute that Ms. Hout used crack cocaine on a regular basis, often with Brown, and that she had a reputation within the local Hispanic community of prostituting herself.

{¶9} George Staley, a special agent in the Bureau of Criminal Identification and Investigation ("BCI") crime scene unit, was called to the scene just before dark. The police set up lighting inside the victim's home, because there was no electricity service to the home. Mr.

Staley was on the scene for 13-14 hours, documenting evidence. He testified that there was a lot of blood and broken glass, including a broken bottle neck in a corner under a hutch in the living room.

{¶10} Mark Kollar, another BCI special agent, testified that Detective Hunt briefed him when he arrived on scene after dark. By that time, the police had reestablished electricity to the home. Agent Kollar was informed of Brown's statement that he entered the home through a rear window, found the victim on the living room floor, and immediately exited through the front door. Agent Kollar took numerous photographs of the scene and collected, packaged, and labeled physical evidence during the 17 hours he spent at the scene. The agent identified a picture of the rear window through which Brown entered the victim's home. A stool was outside beneath the window, while the screen was on the ground. Agent Kollar identified pictures of a broken beer bottle neck found in a corner, a broken glass candle holder, a tooth among glass shards, and the sleeve of a shirt curled up on the victim's back. He further testified that numerous blood swabs and fingerprints were taken from the scene. All evidence was transferred to Detective Hunt.

{¶11} Detective Hunt testified that he was briefed at the scene regarding the circumstances of the 911 call. He testified that he asked Brown to go to the police department to give a statement, and Brown agreed. Detective Hunt testified that, after Officer Smith spoke with Brown, he also questioned him on May 5, 2011, after informing him that he was not a suspect and was free to go at any time. Based on the detective's familiarity with the victim coupled with Brown's statement, Detective Hunt believed that the murder suspect was an Hispanic male with a connection to drugs. He interviewed several Hispanic men associated with Ms. Hout and obtained their DNA samples voluntarily. Further investigation, including a search

of a residence of an Hispanic man with whom Ms. Hout had a relationship failed to produce any evidence relevant to the murder.

{¶12} Back at the scene, Detective Hunt received all evidence collected by the BCI agents and later secured it in the evidence room. He attended the victim's autopsy two days later where he received the victim's rape kit which he sealed and secured in the evidence room. Much of the evidence collected at the scene was later transported to BCI for analysis. On May 16, 2011, a representative from the BCI lab contacted Detective Hunt to inform him that two bloody fingerprints positioned upside down on the broken beer bottle neck found at the scene matched Brown. Moreover, the only DNA evidence found at the scene belonged to either the victim or Brown. At that time, Detective Hunt believed there was probable cause that Brown killed Ms. Hout. He called Brown and requested that he come to the station for a second interview. Brown voluntarily appeared, at which time the detective arrested him, read him his *Miranda* rights, and questioned him after Brown signed a waiver of his rights. Brown became angry when the detective confronted him with the evidence against him.

{¶13} Dr. Dorothy Dean, the deputy medical examiner who performed the postmortem examination on Ms. Hout, testified regarding the "tremendous damage" to the victim's face, forehead, and neck, including bruising, swollen eye lids and chin, numerous tears in the skin, exposed skull bones, missing teeth, jaw and nose fractures, ligature marks all around her neck, and a broken hyoid bone at the top of the throat. Dr. Dean opined that the victim's injuries presented two major types of causes of death, specifically, strangulation and severe blunt force trauma to the head and neck, either of which could have been fatal. Dr. Dean further opined that the nature of the ligature marks indicated that a broad, soft material, consistent with the sleeves of a shirt found wrapped around the victim's back at the scene, was used to strangle Ms. Hout.

She further testified that a semi-circle indentation in the victim's skull bone was consistent with both the broken glass beer bottle neck and broken glass candle holder found at the scene. Dr. Dean issued a report of findings, upon which Dr. Amy Joliff, the Wayne County coroner, relied to conclude that the victim's cause of death was strangulation, with contributing factors of blunt and sharp force trauma.

{¶14} Dawn Limpert is a forensic scientist in the latent print unit at BCI. After citing her education, training, experience, and other qualifications, the trial court qualified her as an expert in the area of fingerprint/palm print processing and identification. Ms. Limpert then explained that patent prints are visible prints left on surfaces by a substance, like paint, grease, or blood, which coated the ridges of the print leaving behind an impression. She obtained fingerprint cards for the victim, two men with a relationship to the victim, and Brown. She testified that she examined the broken beer bottle provided by the Orrville police department relevant to this case and was able to see fingerprints thereon which were sufficient for comparison. Ms. Limpert testified that the ridge detail on the bottle appeared to have been made by a transfer of blood from the fingers to the bottle. Based on her examination, education, training, and experience, she concluded to a reasonable degree of scientific certainty that the bloody fingerprints on the bottle neck belonged to Brown. Moreover, she concluded that the placement of the fingerprints indicated that Brown held the bottle upside down, a position which would have indicated the bottle's use as a weapon.

{¶15} Lindsey Nelsen-Rausch is a forensic scientist in the forensic biology unit at BCI who examines evidence for the presence of bodily fluids and collects samples for later DNA testing. The trial court qualified her as an expert in that area. She testified that she examined four pieces of evidence collected relative to Ms. Hout's death, to wit: the neck of a broken beer

bottle, a broken glass candle holder, the right shoe Brown was wearing at the scene, and Brown's eye glasses. Ms. Nelsen-Rausch testified that all items tested presumptively positive for blood. She collected blood from each item for later DNA testing by an expert in that field.

{¶16} Brenda Gerardi was a forensic scientist in the DNA section of BCI at the time relevant to the investigation of Ms. Hout's death. She is now the lab supervisor. The trial court qualified her as an expert in the area of identification of physiological fluids and DNA analysis. Ms. Gerardi testified that she had DNA standards, i.e., known record samples of individuals, for the victim, Brown, and 11 Hispanic men with known connections to the victim. She further had the DNA samples collected by Ms. Nelsen-Rausch from the neck of the beer bottle, candle holder, shoe, and Brown's glasses. She testified that there was not enough blood from the bottom of Brown's shoe to make an identification. However, she opined that the blood on both the broken glass candle holder and Brown's glasses belonged solely to the victim. Ms. Gerardi further opined that the blood on the broken beer bottle neck contained a DNA mixture from two individuals consistent with profiles from the victim and an unknown male. She was able to exclude all 11 Hispanic men as contributors from this blood profile, but she was not able to exclude Brown as a minor contributor to the sample. She clarified that there was simply not a large enough sample to make a clear finding with regard to Brown.

{¶17} Officer Jaime McGreal of the Orrville police department first met Brown outside the victim's home when she was dispatched to the scene. She testified that there was no way that Brown could have reentered the crime scene where the victim was found. On May 24, 2011, Officer McGreal collected a DNA sample from Brown after obtaining a search warrant. She sealed and labeled the swabs and transported them to the police station where they were logged into evidence.

{¶18} Sergeant William Stitt of the Orrville police department also responded to the scene within ten minutes. He testified that there was no time during which Brown could have reentered the crime scene while the sergeant was there. Sergeant Stitt watched Brown leave the scene with Officer Smith.

{¶19} Sonja Hall and Terry Miller lived across the back yard from Ms. Hout and both knew her as a neighbor. Both Ms. Hall and Mr. Miller testified that they saw Brown at the victim's home on May 4, 2011, between 3:00 and 5:00 p.m. Brown spoke with someone in a green jeep that pulled up to the victim's house, while the victim watched from her doorway. Ms. Hall testified that Ms. Hout then walked to the mailbox and retrieved her mail, and that Brown and the victim walked to the side of the house together. Mr. Miller testified that he saw a deputy and realtor at Ms. Hout's home on May 1, 2011, because they wanted her to vacate the premises. The realtor testified that he and a deputy spoke with Ms. Hout at her home on May 1, 2011, about the pending eviction.

{¶20} Jeremy Kitchen was homeless when the victim took him into her home for a period of time. He testified that he saw Ms. Hout at a drive-thru liquor store on May 2, 2011, and that she told him that she and Brown were having some issues over money. Mr. Kitchen testified that Ms. Hout asked him to come to her home in the evening of May 4, 2011, to talk more about Brown. He testified that he arrived at the victim's home around 10:00 p.m. to find the back door locked, which was unusual because Ms. Hout always left that door unlocked. When no one answered his knock on the door, he walked home.

{¶21} Lisa Corn knew both Brown and Ms. Hout. She was also friends with Chris Linkous, a life-long friend of Brown. Ms. Corn testified that Brown occasionally spent the night in her home because it was close to his place of employment and Brown did not drive. She

testified that Brown appeared at her home around 8:00 p.m. on May 4, 2011, and asked to take a shower. Ms. Corn testified that Brown spent 45 minutes to an hour in the shower, which caused her discomfort because kidney problems necessitated her use of the sole bathroom in the home. When she urged Brown to hurry, he told her to "pee outside." Ms. Corn testified that Brown spent the night in her home, got up in the morning and left, but came back because she was supposed to accompany him to Ms. Hout's home. When Chris Linkous arrived shortly thereafter, Ms. Corn decided not to go with Brown.

{¶22} Ms. Corn testified that Brown sent her two letters from jail after his arrest. The first contained kind sentiments towards her, and informed her that there were fingerprints on a beer bottle found at the victim's home and that Detective Hunt "had it out for him." Brown claimed in the first letter that he did not kill Ms. Hout, but he also asked Ms. Corn if she wanted to write to a murderer. After Brown learned that she spoke with Detective Hunt, he wrote a second letter to Ms. Corn in which he called her profane, vile names, and accused her of "running [her] f***ing big mouth."

{¶23} Chris Linkous confirmed that Brown arrived at Ms. Corn's house during the evening of May 4, 2011, and took a long shower. He testified that, although Brown and Ms. Hout had a father-daughter relationship, Brown "jokingly * * * hit on" Ms. Hout, but she always refused his advances.

{¶24} Reviewing the evidence in a light most favorable to the State, this Court concludes that any rational trier of fact could have found the essential elements of the charge of aggravated murder were proved beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d at paragraph two of the syllabus The State presented evidence that Ms. Hout and Brown were having issues about money and that Ms. Hout wanted to further confide in a friend about the

situation. She was murdered before she had the opportunity to do so. On the night that Ms. Hout was murdered, Brown appeared at the home of a friend and asked to take a shower. He spent 45 minutes to an hour in the shower that evening. The State presented evidence that Brown had Ms. Hout's blood on his fingers when he held a beer bottle upside down in a manner that would have indicated its use as a weapon. The fingerprint expert testified that the substance leaving the prints was wet, indicating the prints were left contemporaneously with the attack which resulted in the spattering of the victim's blood throughout the living room. Brown's eye glasses tested positive for the victim's blood. The State presented sufficient evidence to establish that Brown purposely caused Ms. Hout's death.

{¶25} Brown admitted during his interviews with police to entering the victim's home through a back window, although he asserted that he found the victim dead at that time. There was no explanation for why there was a stool outside the back window, although Brown admitted to police that the stool facilitated his entry into the home. The trier of fact could reasonably have taken into consideration Brown's familiarity with the residence, the placement of the furniture, his knowledge of the locking mechanisms on the interior doors and the fact that he used a stool to enter the home through a window on the date of his "discovery" of Ms. Hout to infer that he had likewise gained access to her residence on the day he killed her by climbing through the back window. The jury had the opportunity to weigh the testimony of the next door neighbor who testified to having seen Brown on the day of the murder, while Brown denied he was there. Mr. Kitchen testified that Ms. Hout always left her back door unlocked, and there is no explanation as to why she would have locked it on this occasion.

{¶26} Under these circumstances, the State presented sufficient evidence to show that Brown entered the victim's home through a back window by force or stealth with the purpose to

attack her, thereby satisfying the elements of aggravated burglary. Accordingly, the State presented sufficient evidence of the crime of aggravated murder.

Manifest weight

This Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. *Thompkins*, 78 Ohio St.3d at 387. Further when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. *Id*.

*State v. Tucker*, 9th Dist. No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. *Thompkins*, 78 Ohio St.3d at 387.

{¶27} Brown presented the testimony of four witnesses and also testified in his own defense.

{¶28} Brown's sister Jacqueline Crook testified that Brown was a father-figure for Ms. Hout. She testified that she frequently drove Brown to Ms. Hout's home, because he did not drive, and that she did so the evening Ms. Hout was found dead. Ms. Crook testified that Brown lived with their mother and that he was in their mother's home around 6:30 p.m. on May 5, 2011, but he left soon thereafter, saying he had to cut someone's grass.

{¶29} Ms. Crook's 19-year old daughter Dishannon Brown testified that she and her mother returned to her grandmother's home on May 5, 2011, between 6:30 and 7:00 p.m. and

that Brown was there. Dishannon testified that she then drove Brown to Lisa Corn's home before he was supposed to cut someone's grass. Instead of going to cut grass, however, they took another detour to Ms. Hout's home, because Brown wanted to check on her. Dishannon testified that Brown went to the back of the victim's home and ran out the front door about five seconds later, and began rolling on the ground and yelling hysterically, "She's gone." Dishannon testified that she had not seen Brown earlier in the day on May 5, 2011, and was not sure if she had seen him at all the day before.

{¶30} Carolyn Brown is another of Brown's sisters. She lived with her mother along with Brown. Carolyn testified that Brown and the victim had a "great" relationship, wherein she called him "dad" and he called her "squirrel." She testified that her mother took Brown to work on May 5, 2011, in the morning and picked him up around 3:00 p.m. She further testified that Brown slept at home on May 3 and 4, 2011. He called home around 10:45 p.m. on May 3, 2011, from the victim's home requesting a ride home.

{¶31} Eva Brown testified that she is Brown's mother and was his main means of transportation. She testified that she drove him to and from work on May 5, 2011, and that he later left her home around 7:00 p.m. to cut someone's grass.

{¶32} Brown testified in his own defense. He testified that he had a "friends with benefits" relationship with the victim's mother before the mother died. He described his relationship with the victim as "fine," "my buddy," and the "daughter I never had." He admitted that he had problems with drugs and that he and the victim smoked crack cocaine together on a regular basis. He testified that he and the victim referred to one other as "enablers." He denied ever having sex with the victim or being her pimp.

{¶33} Brown testified that he last saw Ms. Hout on May 3, 2011, when she asked him to come over and help her pack because she was being evicted. Although the victim had two "dates" scheduled that evening, she instead told Brown, "forget it, let's kick it." Brown testified that Ms. Hout texted someone on his phone, left for about a half hour, and returned with crack cocaine which they smoked together. Brown testified that the victim left for another half hour, returned with more crack, and the two smoked again. He testified that the victim made another call from his phone and the two of them walked to a big house where Brown sat while Ms. Hout walked down an alley alone because Brown "might scare them off." The two returned to the victim's home where "[w]e * * * did what we did and she got the mother load." Brown got another text on his phone which simply read, "$$$$." The victim told him, "mo money, mo money, mo money, mo money, I got to go." Brown testified that he told her, "[B]aby, we had enough. I had enough. I gotta go." He asserted that he did not see Ms. Hout again until he found her dead in her living room two days later. He denied being at her home on May 4, 2011, or talking to someone in a green jeep outside her home on that day.

{¶34} Brown testified that Ms. Hout called him on April 28, 2011, to tell him that she "f'ed up" because she had stolen drugs from some Guatemalan or Mexican men. He testified that she sounded scared and he became scared for her and himself, although he did not explain why.

{¶35} Brown denied taking a long shower at Lisa Corn's home on May 4, 2011. He claimed the shower occurred a week earlier. He admitted sending a mean-spirited and angry letter to Ms. Corn from jail, but he testified that he was merely hurt because she had sold a $7500 LeBron James high school trading card that once belonged to Brown.

{¶36} Brown described the circumstances of his finding Ms. Hout's body. His niece took him first to Ms. Corn's home where he dropped off some clothes and then to Ms. Hout's home. He knocked on the front door, and found it locked. He went to the back door and found it locked too. Brown was surprised the doors were locked because he knew Ms. Hout was only using the home as a "safe house" and that she was not staying there. Because Ms. Hout had painted over all the windows in the home, Brown could not see inside. He saw a stool on the patio and wondered why it was there because he knew he had left that stool in the kitchen. He put the stool under the window, noticed the screen lying on the ground, "popped" the window up, and crawled in backwards. He called out to a neighbor outside, asking, "do you think they'll get me for breaking and entering[?]" Brown then talked to and played with the dog inside the home, and finally yelled for "Squirrel."

{¶37} Brown testified that he made his way to the living room where he ran into a table, fell, and saw the victim for the first time. When he got up, he realized he had something in his hand, but he was unable to see it because it was dark in the room due to the painted windows. Brown threw the object in his hand and he rolled to the front door, hitting a piece of tin from carpeting he and the victim had pulled up. He thought he might have touched the victim's hand. He admitted he had blood on his hand and eye glasses although his explanation was not clear. Brown then testified that it took him a while to open the front door because he was "shaking like a leaf." When he finally got to the porch and down the steps, he tried to call 911 but kept hitting the wrong numbers, so he yelled out for someone else to call.

{¶38} Brown testified that he still had blood on him and his shirt when he went to the police station to give a statement. At that time during direct examination, defense counsel asked

Brown "Why didn't you tell the cops this?" Brown responded that he was a "wreck" at the time. Brown concluded by denying having killed the victim or knowing who did.

{¶39} On cross-examination, Brown admitted that the told the police he did not touch anything at the scene. After clarifying, without objection by defense counsel, that he did not tell the police about tripping and touching things in the house because he was upset, he testified that his comments to police that he had not touched anything really meant that he did not take any pictures of the scene or check out anything. Brown admitted throwing a beer bottle neck after he fell and the bottle neck struck his hand. He claimed he got splinters as a result. Finally, he denied having a cocaine addiction, and claimed that he only used the drug if he had money, and that he never stole money to feed his drug habit.

{¶40} On redirect examination, Brown admitted that he and the victim had their differences but asserted there was never any violence in their relationship.

{¶41} The State recalled Officer Jaime McGreal on rebuttal. She testified that she executed the search warrant at Brown's home, the home he shared with his mother and sister. The officer testified that the three women used a calendar in the home to clarify dates, and that the officer was unable to get conclusive dates and times regarding when Eva Brown picked up her son or where Brown was during the period of May 3-5, 2011.

{¶42} This Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the trier of fact chose to believe certain witnesses' testimony over the testimony of others. *State v. Crowe*, 9th Dist. No. 04CA0098-M, 2005-Ohio-4082, ¶ 22. A thorough review of the record indicates that this is not the exceptional case where the evidence weighs heavily in favor of Brown. The weight of the evidence supports the conclusion that Brown either used stealth to enter Ms. Hout's home, or forced his way into her home through the

back window, in either event for the purpose of harming her. The two had been having difficulties over money, and those issues were significant enough that the victim informed a friend. While Brown and the victim spent an evening smoking crack cocaine, Brown got a text message on his phone that merely displayed four dollar signs. It is reasonable to believe that that was a message demanding payment. The sole means of income ascribed to Ms. Hout was from prostitution, while Brown had only recently started a job, so it is unclear how the two paid for the crack they regularly smoked together. Brown admitted being scared for himself when Ms. Hout told him she had stolen some drugs from some Hispanics. It is not unreasonable to believe that these issues caused a significant rift in Brown's relationship with Ms. Hout, whom he might have believed put his life at risk.

{¶43} Brown admitted to leaving a stool in the victim's kitchen. The jury might have inferred from all of the evidence that he locked the doors and used the stool to exit the kitchen window after killing Ms. Hout, climbing out backwards, allowing him to pull the stool after him and leave it outside, so he could use it later to reenter the home and "discover" the victim.

{¶44} Brown's fingerprints were found in Ms. Hout's blood on the neck of a beer bottle that he had held upside down as if it were being used as a weapon. The deputy medical examiner who performed the victim's autopsy testified that the victim's wounds were consistent with having been made by a broken beer bottle. Brown admitted holding and throwing the beer bottle neck. Because of the nature of the prints, however, the fingerprint expert testified that they would have been transferred to the bottle neck from wet blood on Brown's fingers, not blood that had had a chance to dry.

{¶45} Finally, in this case, there were stark disparities between the testimony of numerous State's witnesses and Brown's testimony. For example, Brown denied having seen the

victim for two days before he found her body, although two of the victim's neighbors testified that he was at her house during the late afternoon of May 4, 2011, before the victim was killed later that night or very early the next morning. Multiple witnesses testified that Brown arrived at their home late in the evening of May 4, 2011, and took an exceedingly long shower, while Brown testified that they were mistaken about the date because he showered at his friend's house several days earlier. The jury could have believed the State's witnesses' testimony over that of Brown in regard to these matters. In addition, the jury might have simply found incredible Brown's testimony about conveniently finding a stool outside the victim's kitchen window on the morning that he found her body, believing instead that he had placed the stool there himself to gain entry to the victim's home in order to kill her.

{¶46} Under these circumstances, Brown's conviction for aggravated murder based on the predicate offense of aggravated burglary was not against the manifest weight of the evidence. Moreover, in light of that conclusion, this Court need not analyze the evidence regarding the predicate offense of kidnapping. Brown's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

> THE CONVICTION FOR COUNT 2, MURDER, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶47} Brown argues that his conviction for murder was against the manifest weight of the evidence. Because of this Court's resolution of the first assignment of error, the second assignment of error has been rendered moot and we decline to address it. *See* App.R. 12(A)(1)(c).

## ASSIGNMENT OF ERROR III

> THE TRIAL COURT COMMITTED BOTH PLAIN ERROR AND STRUCTURAL ERROR IN VIOLATION OF LONNIE BROWN'S RIGHT TO

DUE PROCESS BY TELLING THE JURY THAT HE DID NOT WANT HIS MISSTATEMENT IN JURY INSTRUCTIONS TO RESULT IN AN APPEAL.

{¶48} Brown argues that the trial court prejudiced the jury by mentioning the potential for an appeal during a curative instruction. This Court disagrees.

{¶49} When a defendant alleges that the trial court judge made improper comments during the course of trial, five principles guide our analysis:

> (1) the burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.

*State v. Wade*, 53 Ohio St.2d 182, 188 (1978), vacated on other grounds, *Wade v. Ohio*, 438 U.S. 911 (1978). When no objection to the comments is made at trial, our review is limited to plain error. *Id*. at paragraph one of the syllabus.

{¶50} The context for Brown's alleged error is the trial court's oral instruction to the jury, during which the judge misspoke about the burden of proof:

> If you find that the Defendant proved beyond a reasonable doubt all the essential elements of any one or more of the offenses charged in the separate counts in the indictment, your verdict must be guilty as to such offense or offenses according to your findings. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of any one or more of the offenses charged in the separate counts in the indictment, your verdict must be not guilty as to such offense or offenses according to your findings.

{¶51} At the conclusion of the jury instructions, the prosecuting attorney brought the misstatement to the trial court's attention during a sidebar. The trial court immediately offered a curative instruction:

> The Prosecutor just pointed out to me that I misread something and it's pretty crucial. He's indicated that I said if the Defendant proves beyond a reasonable doubt at some point. I have to make it absolutely clear the Defendant has to prove absolutely nothing in this case. It's the State's burden of proof. So if the State has proven its case beyond a reasonable doubt you would have to find the

Defendant guilty.  If on the other hand the State has not proven its case beyond a reasonable doubt you would have to find the Defendant not guilty.  Again, the Defendant does not have to prove anything in this case.  I think that's been made clear throughout this case and my misstatement, I don't want that to be reason for some appeal later at some time.  So that misstatement was incorrect and I hope all of you understand I just misread it.  I believe the written instructions are actually correct * * * .

**{¶52}** Brown has challenged the curative instruction, arguing that it was plain error because it drew attention to the fact that it was the prosecuting attorney who brought the misstatement to light and because it referenced a possible appeal.  According to Brown, the curative instruction cast the prosecuting attorney in an unfairly favorable light, implied that the judge assumed Brown would be found guilty, and communicated that assumption to the jury.

**{¶53}** In light of the considerations set forth in *Wade*, we are not persuaded by Brown's argument.  The context of the trial court's statement is of particular significance in this case, following directly upon the judge's earlier misstatement and contained within a detailed curative instruction addressing the burden of proof.  Within this framework, the judge's statements did not convey an undue preference for the prosecuting attorney or an assumption that the jury would certainly find Brown guilty.  Instead, the statements conveyed the intention to meticulously correct a mistake so that the Brown would not be prejudiced and the proceedings would not be tainted by error.  Brown's third assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

THE CONVICTION FOR AGGRAVATED MURDER VIOLATED LONNIE BROWN'S RIGHT TO DUE PROCESS AND TO TRIAL BY JURY BECAUSE THE VERDICT FORM DOES NOT STATE WHICH OF TWO POSSIBLE PREDICATE OFFENSES HE WAS FOUND GUILTY OF.  THIS WAS PLAIN ERROR.

{¶54} Brown argues that he was deprived of his right to due process because the trial court failed to include a place on the verdict form for the jury to find Brown guilty of either of the offenses underlying his aggravated murder charge. This Court disagrees.

{¶55} Brown did not object to the verdict forms, so our review is limited to plain error. The existence of "error * * * [is] the starting point for a plain-error inquiry." *State v. Hill*, 92 Ohio St.3d 191, 200 (2001). The Supreme Court of Ohio has rejected the position that due process requires a jury to be informed of and to choose between predicate offenses. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 34-68 (holding that due process did not require the jury to agree on what offense formed the predicate for an aggravated burglary conviction). There is no error in the verdict forms in this case, and Brown's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

LONNIE BROWN WAS DENIED DUE PROCESS OF LAW, AND THE TRIAL COURT COMMITTED PLAIN ERROR IN VIOLATION OF U.S. CONST. AMEND. V, XIV AND OHIO CONST. ART. I, SEC. 10, WHEN THE PROSECUTOR WAS PERMITTED TO IMPEACH HIM BY USING REFERENCES TO HIS PRIOR SILENCES.

{¶56} Brown argues that the prosecutor improperly used his post-*Miranda* silence during a police interview to impeach his testimony on cross-examination. This Court disagrees.

{¶57} Because Brown did not object to the prosecutor's questions during cross-examination, our review is limited to plain error. *See State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 15-16. As noted above, the existence of "error * * * [is] the starting point for a plain-error inquiry." *Hill*, 92 Ohio St.3d at 200. In addition, "a defendant may not 'take advantage of an error that he himself invited or induced.'" *State v. Rohrbaugh*, 126 Ohio St.3d

421, 2010-Ohio-3286, ¶ 10, quoting *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002-Ohio-4849, ¶ 27.

**{¶58}** A defendant's silence after receiving *Miranda* warnings cannot be used for impeachment purposes. *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, ¶ 16, citing *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). When a defendant makes a voluntary statement to police but testifies differently at trial, however, cross-examination is permitted "on any matters of importance that were omitted from [the] statement." *State v. Blackman*, 8th Dist. No. 88608, 2007-Ohio-4168, ¶ 22. "'A contrary rule would foreclose any cross-examination, for fear that it might reveal impeaching information intentionally withheld and inextricably interwoven with that which was divulged.'" *Id.*, quoting *State v. Osborne*, 50 Ohio St.2d 211 (1977), vacated on other grounds sub nom *Osborne v. Ohio*, 438 U.S. 911 (1978).

**{¶59}** In this case, defense counsel reserved his opening statement until immediately prior to Brown's case in chief. Defense counsel set the tone of the defense by stating that "trial is as much about what you don't hear and don't see as it very often is about what you hear and see." Later, during direct examination of Brown, defense counsel questioned Brown about the blood that he testified had been on his hands and clothing at the scene. After Brown responded, defense counsel asked him, "Why didn't you tell the cops this?" Brown explained he did not tell the police about the blood because he was a "wreck" at the time. On cross-examination, the assistant prosecutor, without objection, merely followed up on defense counsel's line of questioning when he attempted to clarify Brown's earlier testimony that he got blood on his person and clothing after he tripped inside the victim's house and that he did not tell the police about the blood because he was upset at the time.

{¶60} Brown made statements on two occasions to the police. On May 5, 2011, he voluntarily spoke with Officer Smith and Detective Hunt at a time when he was not a suspect and not under arrest. He voluntarily made another statement to police on May 16, 2011, after he was arrested, read his *Miranda* rights, and executed a written waiver of those rights. Accordingly, all statements Brown made to the police were voluntary. At trial, for the first time, Brown admitted that he had blood on his hands and clothing after exiting the victim's home on May 5, 2011. It was defense counsel who first questioned Brown about his failure to tell the police about the blood. The State's question on cross-examination merely clarified precisely the same issue defense counsel raised. Under these circumstances, Brown cannot be heard to complain of error, if any existed, that his attorney invited or induced. *See Rohrbaugh* at ¶ 10. Brown's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

THE TRIAL COURT'S SENTENCE WAS CONTRARY TO LAW BECAUSE IT INCLUDED A TERM OF POST RELEASE CONTROL WHEN THE ONLY CONVICTION WAS FOR AN UNCLASSIFIED FELONY. THE PRC SANCTION NOTICE IS ALSO INCORRECT.

{¶61} Brown's final assignment of error is that because he was only convicted of aggravated murder, the trial court erred by imposing a term of postrelease control. This Court agrees.

{¶62} "[A]n individual sentenced for aggravated murder * * * is not subject to postrelease control, because that crime is an unclassified felony to which the postrelease-control statute does not apply. R.C. 2967.28. Instead, such a person is either ineligible for parole or becomes eligible for parole after serving a period of 20, 25, or 30 years in prison." *State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, ¶ 36. The trial court erred by informing Brown that postrelease control would be part of his sentence, and that portion of the sentencing order is void.

*See State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, ¶ 26.  Accordingly, this assignment of error is sustained, and the matter is remanded to the trial court so that the sentencing entry may be corrected.  *See State v. Evans*, 8th Dist. No. 95692, 2011-Ohio-2153, ¶ 9-11.

### III.

**{¶63}**  Brown's first, third, fourth, and fifth assignments of error are overruled.  We decline to address the second assignment of error.  The sixth assignment of error is sustained, and the matter is remanded for correction of the sentencing entry as it relates to the matter of the imposition of postrelease control.

> Judgment affirmed in part,
> reversed in part,
> and cause remanded.

---

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

WILLIAM R. BAIRD
FOR THE COURT

MOORE, P. J.
BELFANCE, J.
CONCUR.

(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to §6(C), Article IV, Constitution.)


APPEARANCES:

CLARKE W. OWENS, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, for Appellee.