[Cite as *State v. Reed*, 2013-Ohio-3970.]

STATE OF OHIO )
)ss:
COUNTY OF WAYNE )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

STATE OF OHIO

    Appellee

v.

LASHAUN M. REED

    Appellant

C.A. No.    12CA0051

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.    12-CR-0034

DECISION AND JOURNAL ENTRY

Dated: September 16, 2013

WHITMORE, Judge.

{¶1}　Defendant-Appellant, Lashaun Reed, appeals from his convictions in the Wayne County Court of Common Pleas. This Court affirms in part, reverses in part, and remands for the court to correct the sentencing entry.

I

{¶2}　At approximately 2:30 a.m. on the morning of December 10, 2011, Ashon Palmer, Samantha Ralston, Angela Rolen, and Erica Lunsford drove to Orrville to pick up Lunsford's boyfriend from work. During this trip, Palmer received a phone call from his half-brother, Lashaun Reed. Palmer told Reed to calm down and to wait until he got there. Palmer then asked Lunsford if she knew who "Gucci" and "Bear" were. Lunsford told him that they were "Detroit boys," people from Detroit that "hang out" around the City of Wooster, Ohio.

{¶3}　Upon the group's return from Orrville, Palmer had them drop him off at an intersection, where Reed picked him up. According to Palmer, Reed had a handgun but wanted

more firepower because he believed Gucci was armed and going to "shoot up his house." Reed requested Palmer's AK-47, and the two went to retrieve the gun from a friend's house. The gun, however, was missing the magazine, which rendered it useless. Sometime thereafter, Palmer called his aunt to come pick him up at Reed's house.

{¶4} As Palmer was getting into his aunt's car, he noticed Reed get into his car and leave. Palmer asked his aunt to follow him. Reed pulled down an alley close to North Street, and Palmer jumped out of the car to follow him on foot. According to Palmer, he was attempting to prevent Reed from going to look for Gucci. As the two walked out of the alley onto North Street, Reed noticed a few people standing in front of a house. Reed approached the man standing on the sidewalk, placed a handgun to his chest, and asked if he was "Gucci." Gucci grabbed the gun and it fired. Reed and Gucci wrestled to the ground. After the first shot, Samantha Ralston, who had been standing in front of the house, ran inside. Palmer testified that he also took off running after the first shot. According to Palmer, he looked back as he was running away and saw Reed stand up and fire another shot at Gucci, who was still on the ground attempting to stand up. Palmer called his aunt again to come pick him up. Gucci was helped inside the North Street house and calls were made to 911. Gucci died shortly after being transported to the hospital.

{¶5} Reed was charged with one count of aggravated murder, in violation of R.C. 2903.01(A), and one count of murder, in violation of R.C. 2903.02(A), both with firearm specifications. A jury found Reed guilty of all charges. The trial court sentenced him to life without parole for aggravated murder and three years for the attendant firearm specification, all to be served consecutive to a sentence he is serving from another case. The court concluded the

murder charge was a lesser included offense and did not impose a sentence. The court further ordered that Reed is subject to a mandatory five years of post-release control upon his release.

{¶6} Reed now appeals and raises ten assignments of error for our review. To facilitate our analysis, we combine several of the assignments of error.

II

Assignment of Error Number One

THE EVIDENCE WAS INSUFFICIENT FOR CONVICTION OF AGGRAVATED MURDER UNDER R.C. 2903.01(A)(1).

{¶7} In his first assignment of error, Reed argues that the State failed to produce sufficient evidence to support his conviction for aggravated murder.

{¶8} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶9} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

{¶10} R.C. 2903.01(A) provides that "[n]o person shall purposefully, and with prior calculation and design, cause the death of another * * *." "A person acts purposely when it is his

specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶11} "[T]he phrase 'prior calculation and design' is a single divisible term, describing the mens rea element of the proof necessary to find a violation of R.C. 2903.01(A)." (Emphasis omitted.) *State v. Taylor*, 78 Ohio St.3d 15, 18 (1997). There is no bright-line test to determine prior calculation and design; each case must be viewed based on its particular facts. *Id*. at 20-21. The Ohio Supreme Court cited several factors that were used by the Eighth District Court of Appeals in determining whether prior calculation and design existed. Those factors were: "(1) Did the accused and the victim know each other, and if so, was the relationship strained? (2) Did the accused give thought and preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events'?" *Id*. at 19, citing *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist.1976). While these factors are important to consider, these are not the exclusive factors in determining whether there was prior calculation and design. "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated design to kill, a finding by the trier of fact of prior calculation is justified." *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus.

{¶12} Here, Reed argues that the facts do not support a finding of prior calculation and design. Specifically, he argues that the record supports a finding that Gucci was a drug dealer and that he was shot in self-defense during a struggle over a gun. Moreover, according to Reed,

the shooting occurred in a chance encounter on the street, in an instantaneous eruption of violence, not in a planned attack.

{¶13} Just before 3:00 a.m., Palmer was a passenger in the car headed to Orrville when he received a phone call from Reed. Palmer told Reed to calm down and to wait for him to get there. According to Palmer, Reed told him that he had gotten into an argument with Bear and Gucci at Deb Cook's house and that he feared they were going to "shoot up his house." Because of this, Reed asked Palmer for his AK-47. Palmer knew that Reed had a small handgun, but Reed wanted more protection.

{¶14} Reed picked up Palmer upon his return to Wooster and the two went to a friend's house to retrieve the AK-47. The gun, however, did not have a magazine clip or ammunition. According to Palmer, this upset Reed and the two returned to Reed's house. Sometime thereafter, Palmer called his Aunt Joan to come pick him up, which she did. As Palmer was getting into his aunt's car, he noticed Reed leaving. Palmer asked his aunt to follow Reed's car. After Reed pulled down an alleyway, Palmer got out of his aunt's car and followed him on foot. Palmer believed that Reed was going to Deb Cook's house to look for Gucci and/or Bear. To get to Cook's house from where Reed had parked his car, he had to walk north in the alleyway and turn east on North Street. Cook's house was located where North Street dead-ends into Spink Street.

{¶15} Palmer testified that he walked with Reed up the alleyway, and, as soon as they turned onto North Street, they saw some people standing outside a house. According to Palmer, Reed sped up and confronted the man standing on the sidewalk, shoved his handgun in the man's chest, and asked if he was Gucci. Palmer stated that Gucci, the man on the sidewalk, grabbed for the gun and it fired. After the first shot, Palmer took off running toward Spink Street. Palmer

testified that he looked back while he was running away and saw Reed shoot Gucci. Palmer said that it appeared that Gucci and Reed had both fallen to the ground in a fight over the gun, but that when Reed shot Gucci, he was standing over Gucci, who was still on the ground. Gucci died from a single bullet wound. The bullet entered his back by his shoulder blade and travelled down through his lungs, liver, stomach, and colon. The bullet exited out the right lower abdomen.

{¶16} Viewing the evidence in a light most favorable to the State, there is sufficient evidence to support a finding that Reed had an argument earlier that evening with Gucci. While the record does not reflect what the argument was about, the evidence does indicate that Reed thought there was a threat to his safety, that he wanted to arm himself, and that he went looking for Gucci and/or Bear. After discovering that Palmer's AK-47 was useless, Reed took his handgun and went to search for the men at Deb Cook's house. Reed parked in an alleyway behind a group of houses and decided to walk down North Street to find Gucci. On his way to Cook's house, Reed came across his target. Reed approached Gucci with his gun drawn and shoved it in his chest. While Gucci did attempt to wrestle the gun from Reed's control, there was testimony that Reed had broken free from Gucci and was standing over him when he fired the fatal bullet into Gucci's back. Viewing the evidence in a light most favorable to the State, a jury could have reasonably concluded that Reed formed the intent to kill Gucci when he left his house with his gun in search for Gucci. Reed's "method of shooting * * * as well as his apparent determination to follow through on a specific course of action, sufficiently supports the finding that [Reed] had adopted a plan to kill." *Taylor*, 78 Ohio St.3d at 22, quoting *State v. Toth*, 52 Ohio St.2d 206, 213 (1977). Reed's first assignment of error is overruled.

<u>Assignment of Error Number Two</u>

THE VERDICT OF GUILTY OF AGGRAVATED MURDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

<u>Assignment of Error Number Three</u>

THE VERDICT OF GUILTY OF MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶17}** In his second and third assignments of error, Reed argues that his aggravated murder and murder convictions are against the manifest weight of the evidence. The heart of Reed's argument is that the weight of the evidence supports the conclusion that Palmer shot Gucci.

**{¶18}** "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins*, 78 Ohio St.3d at 387, quoting *Black's* at 1594.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387. An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

## A Review of the Evidence

{¶19}  Palmer, Ralston, Lunsford, and Rolen all testified that at approximately 2:30 a.m. on December 10, 2011, they all drove out to Orrville to pick up Lunsford's boyfriend, Octavio, from work.  During this trip, Palmer received a call on his cell phone from Reed.  Palmer was heard telling Reed to calm down and to wait until he got there.  Palmer then asked about the identity of men going by the street names of Gucci and Bear.  Upon returning to Wooster, the group dropped off Palmer at the corner of Spink and Bowman.

        a.   Palmer's testimony

{¶20}  According to Palmer, Reed picked him up at the corner of Spink and Bowman and the two went to retrieve Palmer's AK-47 that was being stored at a friend's house.  After discovering that the gun was missing the magazine clip, the two returned to Reed's house.  Palmer testified that sometime thereafter he called his Aunt Joan to come and pick him up.  As he was getting into his aunt's car, he noticed Reed driving away.  Palmer asked his aunt to follow him.  Reed pulled down an alleyway just south of North Street.  Palmer got out of his aunt's car and followed on foot.  Palmer believed Reed was on his way to Deb Cook's house to look for Gucci.  He caught up with Reed and tried to talk him out of going over to Cook's house, but Reed just ignored him and kept on walking.  When they exited the alley onto North Street, they noticed some people standing in front of a house.  Reed sped up and approached a man standing on the sidewalk.  Reed asked the man if he was Gucci, but Palmer did not remember Gucci responding. Palmer testified that another man, Michael Thomas, was standing nearby, but that Thomas did not reply either.  Reed then pulled a gun and shoved it into Gucci's chest.  Palmer said that Gucci then grabbed for the gun and it discharged.  Palmer explained that he took off running toward Spink Street after the first shot, but turned to look back as he was running away.

He testified that he saw Gucci and Reed wrestle over the gun and fall to the ground. He further testified that he saw Reed stand up and shoot Gucci, who was still on the ground trying to get up. Palmer ran to Dino's at the corner of Beall and East Liberty Street and called his Aunt Joan to pick him up.

### b. Aunt Joan's testimony

{¶21} Aunt Joan testified that she is Palmer's maternal aunt and that she is unrelated to Reed. Aunt Joan explained that she received a number of calls from Palmer the evening of the shooting. One call was for her to pick Palmer up at Reed's house. When she arrived, Palmer got into her car and asked her to follow Reed. She dropped him off on Beall close to where it dead ends into East Liberty Street. She testified that she then went home, a trip which takes about 10 to 15 minutes. When she arrived home, she said she received another call from Palmer asking her to come back and pick him up at Dino's on East Liberty Street, not far from where she had dropped him off. Palmer told her about the shooting when they got back to her apartment. She testified that he did not stay at her place long because she did not want to get involved. The day after Gucci was shot, Aunt Joan was traveling in her car when it was struck by bullets. She testified that just before the shooting Reed's girlfriend was a passenger in the car.

{¶22} On cross-examination Aunt Joan was asked about calls from Palmer at 2:46 a.m., 3:42 a.m., 4:12 a.m., and 6:16 a.m. She testified that while she could not be sure of the timing, that those times sounded right. She testified that the 6:16 a.m. call was not the call in which Palmer asked her to pick him up at Dino's, but that she was not sure if it was the 4:12 a.m. call either. Aunt Joan explained that she had another phone and it was possible that Palmer also called her on the other phone, but she could not remember.

{¶23} Palmer testified that he was unable to remember how many times he called his Aunt Joan that evening. He remembered calling her once to pick him up at Reed's and once to pick him up at Dino's after the shooting. According to Officer McConnell, the shooting was reported at 4:21 a.m.

c. Ralston's testimony

{¶24} Ralston testified that she had sent Michael Thomas a text to come meet her at the North Street house, and when he arrived at about 4:15 a.m., she stepped outside to talk to him. Ralston said that Gucci came along with Thomas, but that he stayed down on the sidewalk while Ralston and Thomas were talking. When she heard voices from people coming down the street, she turned and saw two guys walking from across the street toward Gucci. Ralston recognized Palmer as one of the two men because he was wearing the same shirt that he had on earlier in the evening when the group drove to Orrville together. Ralston explained that she had seen the other man before, but did not know his name. She later identified that other man as Reed. According to Ralston, as Reed approached Gucci, he asked if he was Gucci and asked Thomas if he was a man known as "Fresh." Ralston did not remember Thomas or Gucci responding before Reed pulled out a gun and fired toward Gucci. At that point, Ralston said she took off running into the house and did not look back. She heard another shot as she opened the door, but did not see anything because she was facing away from the men. She explained that she assumed the first shot missed Gucci because he was shot in the back and the first shot was fired while Gucci was facing Reed.

{¶25} Ralston ran into the house and told Lunsford and Octavio that Gucci had been shot. Lunsford and Rolen both called the police. Ralston testified that she heard Gucci say that "Shaun" shot him, but does not remember if she told the police that. Ralston admitted that she

was not willing to talk to the police when they were questioning her at the house because she was scared. Not long after Gucci was taken to the hospital, Ralston was taken to the police station to give a statement. At the station, she told the police that she could identify the shooter, and the police prepared a photo line-up for her to view.

### d. Photo arrays

{¶26} Detective Juan McCloud compiled six photographs from the Wayne County Jail booking system, one of which was of Reed. The photographs were of very poor quality and had a purplish tint to them. Detective Robert Merillat, acting as the blind administrator, conducted the photo line-up. After viewing the six photographs, Ralston was not able to make an identification. Detective Merillat showed her the same line-up again. Ralston lingered over one of the photographs (which was not of Reed), but said she was not sure. After seeing the photographs, Detective Merillat expressed concern about their quality. Detective McCloud then compiled another six photographs from another database. Reed was the only person to appear in both photo arrays. Ralston identified Reed from this second line-up, and ranked her certainty as 8 out of 10. After identifying Reed's photograph, Detective McCloud showed Ralston more photographs of Reed. At that point, Ralston said she was sure that he was the shooter.

### e. The gun

{¶27} The police searched the area surrounding the North Street home for the gun used in the shooting. The area was searched the night of the shooting and at least a couple of times in the week following. A week after the shooting, a gun was found in the alleyway. Detective McCloud testified that Palmer told him where to find the gun. According to Detective McCloud, Palmer said that Reed had told him where he put the gun. Palmer, on the other hand, testified that while he talked to Reed by phone in the days following the shooting, the two never

discussed the location of the gun. According to Palmer, he only told the police where Reed parked his car in the alleyway before the shooting.

{¶28} In searching the area after the shooting, the police found a bullet lodged inside the siding of the house next door to where Gucci was shot. Michael Roberts, a forensic scientist at BCI, testified that there was not enough detail to identify or eliminate the gun as being the one that fired that bullet. Roberts could only say that the test bullets he fired from the gun had "corresponding class characteristics" to the bullet recovered. Forensic testing of the gun did not reveal any fingerprint or DNA evidence.

f. Identification of the shooter

{¶29} Officer Brandon Heim was one of the first officers to arrive on scene after the shooting. Officer Heim testified that he located Gucci face down on the living room floor, with someone holding a cloth to his back. Officer Heim took over holding the cloth over the bullet wound and began asking him questions. Gucci kept telling Officer Heim that he could not breathe. When Officer Heim asked him if he knew who shot him, Gucci responded, "Shaun." Ralston and Lunsford testified that they also heard Gucci name "Shaun" as the shooter. However, Detective McCloud testified that neither Ralston nor Lunsford told him that during their interviews.

{¶30} Reed argued at trial, and now on appeal, that Gucci was referring to Ashon and not Lashaun when he identified the shooter. The second syllable of both Ashon and Lashaun is pronounced "Shaun."

{¶31} The prosecution submitted into evidence portions of recordings of telephone conversations Reed made from the Wayne County Jail while awaiting trial. In one of these recordings, Reed is trying to teach his 3 year old daughter to call her "Uncle Ashon" a "snitchin

bitch." When the child responds with a question, Reed corrects her and says "no, not daddy," "Uncle *A*shon," placing an emphasis on the first syllable.

{¶32} Deb Cook testified for the defense. According to Cook, in the early morning hours of December 10, 2011, she was sitting in her house talking with Gucci. She testified that a man she only knew as Shaun was also there, but that she asked him to leave because Gucci and Shaun "just didn't hit it off." Cook identified Palmer as the man she knew as Shaun, and the one that had an argument with Gucci at her house about an hour before the shooting.

{¶33} Cook testified that about an hour after both Palmer and Gucci left her house, she was standing in her kitchen and heard three gunshots. She went to her bedroom window and looked out. From her window she could see all of North Street. Cook testified that she saw Palmer running toward a vehicle, jump in, and drive away. On cross-examination, Cook confirmed that she had told the police that prior to the shooting, she saw a car pull up in front of a house, saw Palmer jump out and run around behind the house, and then she heard the gunfire and saw Palmer run back to the car and drive away. Cook testified that she did not see anybody else, including Gucci, on the street when she looked out of her window after the gunshots.

g. Palmer granted immunity

{¶34} Palmer was called to testify at trial by the State. Shortly after beginning his testimony, Palmer asserted his Fifth Amendment privilege against self-incrimination. The court took a recess and provided Palmer the opportunity to confer with an attorney. The State then filed a motion to compel Palmer's testimony and to grant him transactional immunity. The court granted the motion, and Palmer's testimony in front of the jury resumed. The jury was made aware of Palmer's immunity through questions from both the State and the defense. Palmer explained that he was legally prohibited from owning a gun and had not wanted to testify about

his AK-47. He also said that he did not want to testify against Reed and was only doing so because he is required to.

**Weighing the Evidence**

{¶35} Reed argues that the jury lost its way in believing Palmer's testimony over Cook's. However, merely because the jury chose to believe Palmer's version of the events does not make the verdicts against the manifest weight of the evidence. *State v. Gurley*, 9th Dist. Summit No. 26355, 2012-Ohio-5867, ¶ 11, quoting *State v. Andrews*, 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28 ("A verdict is not against the manifest weight of the evidence because the jury chose to believe the State's witnesses rather than the defense witnesses.").

{¶36} Reed further argues that the jury lost its way in believing that Reed, and not Palmer, shot Gucci. Specifically, Reed argues that: (1) if he had a prior argument with Gucci, there would be no reason for him to ask the victim if he was Gucci before shooting him; (2) nobody in the car trip to Orrville mentioned that Palmer called his Aunt Joan at 2:46 a.m.; and (3) Palmer's call to his Aunt Joan at 4:12 a.m. came 11 minutes before the police were dispatched to the scene.

{¶37} While there are some troubling inconsistencies in the evidence, we conclude that these inconsistences do not make this the exceptional case where the evidence weighs heavily *against* the conviction. *See Otten*, 33 Ohio App.3d at 340. According to Palmer, while he was riding in a car with others to pick up Octavio from work, Reed called and told him that he had gotten into an argument with Bear and Gucci at Deb Cook's house. During that conversation, Reed then asked for Palmer's gun. Additionally, Detective McCloud testified that Cook told him that "Shaun" arrived at her house with Corey Evans. Evans is Reed's cousin and was living with Reed at the time. Although Cook testified that Palmer was the person who got into the

altercation with Gucci at her home, a rational juror could have disbelieved Cook's testimony. Alternatively, a rational jury could have concluded that Cook was mistaken in her identification of the man she knew as "Shaun," and that it was Reed, not Palmer, that had an altercation with Gucci that night at Cook's house.

{¶38} While it is curious that Reed would have to ask Gucci his identity if the two had an altercation earlier that evening, there is no evidence that the two were otherwise familiar with one another. Nor is there any evidence that any introductions had occurred between Gucci and the "Shaun." However, Cook did not describe how long Gucci and "Shaun" were together at her house, how many people were present at the time, or the type of disagreement the two had. She only testified that Gucci and Shaun did not "hit it off," and that she asked Shaun to leave. Without evidence to the contrary, it is possible that the interaction between the two was brief, requiring Reed to confirm Gucci's identity when he came across him standing on North Street.

{¶39} As to the timing of the phone calls from Palmer to Aunt Joan, the record is unclear where these specific times came from. It appears from her testimony that the times were detailed in a police report by a Detective Lemmon. The report was not admitted into evidence and the State objected to the defense using it for impeachment purposes. Aunt Joan did testify that she had shown a Detective Lemmon her phone and had told him that she had received the calls from Palmer. Detective Lemmon was not called as a witness, and Aunt Joan testified that she could not be sure of the timing of the calls, but that the times mentioned by defense counsel sounded right. Aunt Joan could not remember what the nature of the calls were, other than one was Palmer requesting to be picked up at Reed's and the next one was Palmer requesting to be picked up at Dino's on East Liberty Street. Aunt Joan also testified that it was possible Palmer called her on another phone as well. We are restricted to reviewing the evidence that is

contained in the record. While the timing of Palmer's call, relative to when the police were dispatched, is concerning, we cannot conclude that it is enough to show that the jury clearly lost its way in resolving this conflict. *See Otten* at 340.

**{¶40}** After a careful review of the record, we cannot conclude that the *greater* amount of credible evidence weighs *heavily* in favor of Reed. *See Thompkins*, 78 Ohio St.3d at 387, quoting *Black's* at 1594. As such, Reed's convictions for aggravated murder and murder are not against the manifest weight of the evidence. Reed's second and third assignments of error are overruled.

<u>Assignment of Error Number Four</u>

THE PHOTO ARRAYS USED BY THE POLICE TO OBTAIN IDENTIFICATIONS OF LASHAUN REED WERE IMPROPERLY SUGGESTIVE IN VIOLATION OF U.S. CONST. AMEND.V AND XIV, AND OHIO CONST. ART.1, SEC. 10, AND FAILED TO COMPLY WITH OHIO REVISED CODE 2933.83, AND THE USE OF PHOTO ARRAY TESTIMONY AND EVIDENCE DURING TRIAL WAS PLAIN ERROR.

<u>Assignment of Error Number Ten</u>

THE CONVICTION IS REVERSIBLE ON GROUNDS OF INEFFECTIVE ASSISTANCE OF COUNSEL.

**{¶41}** In his fourth assignment of error, Reed argues that photo arrays shown to Ralston were impermissibly suggestive and her identification of Reed should have been suppressed. In addition, as part of his tenth assignment of error, Reed argues that his trial counsel was ineffective for failing to file a motion to suppress Ralston's photo array identification and for failing to object to the testimony of her identification.

**{¶42}** Reed did not file a motion to suppress Ralston's identification and did not object to the testimony of the photo arrays at trial. Crim.R. 12 requires challenges to the admissibility of identification testimony to be raised by way of a motion to suppress, prior to trial. *State v.*

*Jones*, 9th Dist. Summit No. 26226, 2012-Ohio-2744, ¶ 14. Because Reed did not challenge the admissibility of the identification, he has forfeited any objection to it and limited himself to a claim of plain error. *Id.* Under Crim.R. 52, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Plain error is not present unless but for the error complained of, the outcome of the trial would have been different." *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 78.

{¶43} Determining the admissibility of identification testimony is a two-step process. The first step is to determine whether the process in procuring the identification was unduly suggestive. *State v. Villa*, 9th Dist. Lorain No. 05CA008773, 2006-Ohio-4529, ¶ 11. Second, if the identification procedure was unduly suggestive, the court must determine whether the identification is nevertheless reliable based on the totality of the circumstances. *Id.* However, if the procedure was not unduly suggestive, the reliability of the identification is a matter of weight of the evidence, not admissibility. *See State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 22. The amount of weight to be given to the evidence and the credibility of the witnesses is within the province of the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶44} Ralston was escorted to the police station for questioning shortly after the shooting. At the station, she told Detective McCloud that she could identify the person that shot Gucci. Detective McCloud then put together a photo line-up which consisted of six photographs taken from the Wayne County Jail database. The photographs were of poor quality and had a purple tint to them. Detective McCloud placed the photos in folders and had Detective Merillat act as the blind administrator in compliance with R.C. 2933.83. Detective Merillat gave Ralston the following instructions prior to administering the photo line-up.

I'm going to show you folders containing photographs. The photographs may or may not contain a picture of the person who committed the crime now being investigated. I do not know who the suspect is. Keep in mind that hairstyles, beards and mustaches may be easily changed and also photographs may not always depict the true complexion of a person. It may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photos or any other differences in the type or style of the photographs. Do not tell other witnesses that you have or have not identified anyone.

{¶45} Ralston was unable to make an identification after viewing this first photo array. She was then given the opportunity to view the photographs a second time. While she lingered over one of the photographs during her second viewing, she was unable to identify any of the photographs as being the person that shot Gucci.

{¶46} After seeing the photographs, Detective Merillat expressed concerns over their quality. He testified that the photos "were very dark and had sort of a purplish tint, [they] didn't really show the complexion of the person * * * [, and] that it would be difficult for anybody to make an identification [from] photographs that were of that * * * poor [quality]." Detective McCloud then compiled another photo array of six photographs taken from Ohio Law Enforcement Gateway ("OLEG") images. Reed was the only person to appear in both photo line-ups.

{¶47} After viewing the second photo array, Ralston identified Reed's photograph as the person that shot Gucci. She ranked her degree of certainty as 8 out of 10. After selecting the photograph, Detective McCloud showed Ralston additional photographs of Reed. She then said she was sure that he was the shooter.

{¶48} Reed argues that Ralston's identification should have been excluded because the administration of two photo arrays, with Reed being the only person to appear in both, was unduly suggestive. Reed further argues that the photo arrays were not administered in compliance with R.C. 2933.83. We disagree.

{¶49} The two photo arrays used different photographs of Reed. The first photograph was a "booking photo[ ] from the Wayne County Jail." It is dark, making it nearly impossible to distinguish between his jawline and his neck, and there is a flash spot on his forehead. The photograph is also tinted purple. Viewing this photograph, a person would not be able to determine Reed's complexion. In contrast, the second photograph of Reed was taken from OLEG images. The OLEG database contains driver's license and state identification photographs. This photograph is a very close and clear image of his face. Comparing the two photographs, despite having the same facial hair, it is not easily determined that they are photographs of the same person. "[R]epeated showing of a suspect's picture in police photo arrays is not unduly suggestive if the photographs do not resemble each other." *United States v. Lewis*, 838 F.Supp.2d 689, 701 (S.D.Ohio 2012), quoting *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1052 (7th Cir.2003). Because the photograph of Reed used in the first array bared little resemblance to Reed's photograph included in the second array, the repeated showing was not unduly suggestive.

{¶50} Reed further argues that the officers administering the photo array did not comply with R.C. 2933.83 and that this should be considered in our analysis. R.C. 2933.83(C)(1). Specifically, Reed argues that: (1) Ralston did not request a second view of the first photo array; (2) Ralston did not state her confidence in her identification in her own words; (3) the instructions given to Ralston did not comply with R.C. 2933.83(A)(6)(e); and (4) the photo line-ups were not properly administered because Detective McCloud participated. We disagree and conclude that the photo line-ups were given in compliance with the statute.

{¶51} First, there is no testimony that Ralston did not ask to see the first photo array a second time. Neither the State nor the defense asked this question. However, Detective Merillat

testified that he showed Ralston the first array a second time because "the law permits [an additional showing] if the person wants to look at the photos again." The logical inference here is that Ralston wanted to see the photographs again. Second, after Ralston selected Reed's photograph from the second array, she indicated that her level of certainty was 8 out of 10. This was her stating her confidence of her identification in her own words. Third, while the instructions given to Ralston did not contain all of the requirements of R.C. 2933.83(A)(6)(e), the instructions that were omitted do not make the process suggestive. Specifically, Detective Merillat did not inform Ralston not to show him any of the photographs or instruct her to make any identification by folder number only. There is no evidence that Detective Merillat saw the photographs prior to the conclusion of the line-up, or that Ralston identified Reed's photo from anything other than the folder number. Even assuming that these provisions were not followed, Detective Merillat did not know the identity of the suspect so we cannot imagine how he could have influenced Ralston's selection.

{¶52} Having concluded that the administration of the photo line-ups was not unduly suggestive, we do not address the issue of reliability. The reliability of the identification is a matter of weight of the evidence, not admissibility. *See Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, at ¶ 22. The amount of weight to be given to the evidence and the credibility of the witnesses is a matter for the trier of fact. *DeHass*, 10 Ohio St.2d at paragraph one of the syllabus. Because the court did not err in admitting Ralston's identification testimony, we cannot conclude that plain error exists.

{¶53} As part of his tenth assignment of error, Reed argues that his trial counsel was ineffective for failing to file a motion to suppress Ralston's photo array identification and for failing to object to the testimony of her identification. To prove ineffective assistance of

counsel, Reed must establish that (1) his counsel's performance was deficient, and (2) that but for counsel's deficient performance there is a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Having concluded that the administration of the photo line-ups was not unduly suggestive, Ralston's identification was properly admitted. As such, Reed cannot establish that his counsel's performance was deficient for failing to object or move to suppress her identification of Reed.

{¶54} Reed's fourth assignment of error is overruled. His tenth assignment of error, as it relates to Ralston's identification of Reed, is also overruled.

### Assignment of Error Number Five

IT WAS PLAIN ERROR TO ALLOW THE PROSECUTOR TO ARGUE THAT ASHON PALMER HAD NO MOTIVE TO LIE BECAUSE HE COULD NOT HAVE BEEN PROSECUTED.

### Assignment of Error Number Ten

THE CONVICTION IS REVERSIBLE ON GROUNDS OF INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶55} In his fifth assignment of error, Reed argues that the prosecutor engaged in misconduct when he said in closing arguments that Palmer "could not have been prosecuted for the crime because he had transactional immunity, and could have admitted to shooting Gucci and gotten his brother[, Reed,] off." In addition to plain error, Reed, as part of his tenth assignment of error, argues that his trial counsel was ineffective for failing to object to the prosecutor's statement.

{¶56} In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper

conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6, citing *State v. Carter*, 72 Ohio St.3d 545, 557 (1995). The defendant must show that, but for the prosecutor's misconduct, the jury would not have convicted him. *State v. Lollis*, 9th Dist. Summit No. 24826, 2010-Ohio-4457, ¶ 24. "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶57} When a defendant fails to object to alleged prosecutorial misconduct, he or she waives all but plain error. *State v. Chapman*, 9th Dist. Lorain No. 07CA009161, 2008-Ohio-1452, ¶ 23. Under Crim.R. 52, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Plain error is not present unless but for the error complained of, the outcome of the trial would have been different." *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, at ¶ 78.

{¶58} The prosecutor is given considerable latitude in closing arguments. *State v. Lute*, 9th Dist. Lorain No. 99CA007431, 2000 WL 1729486, *7 (Nov. 22, 2000). However, a prosecutor may not vouch for a witness' credibility by implying knowledge of facts outside of the record or express a personal belief or opinion as to the credibility of a witness. *State v. Williams*, 79 Ohio St.3d 1, 12 (1997).

{¶59} In the rebuttal portion of the State's closing argument, the prosecutor described Palmer's immunity.

> Now, the one thing that we did yesterday to explain to you some other legal matters, we gave immunity to Ashon Palmer to testify. He was concerned that he probably shouldn't have had that AK legally because of his own history. But that immunity was – it's called transactional immunity, that he cannot be prosecuted for his involvement in this case. And what could he have done. What could he have done to protect his brother if he wanted to? He could have gotten up here

and said it's true, I shot Gucci and we couldn't have prosecuted him. That's not what he said. The perfect opportunity, he could have said I shot Gucci and gotten his own brother off the hook, but that's not what he said. The Defense didn't want to mention that either. We want you to look at all the evidence in this case and compare and consider all the evidence.

{¶60} The prosecutor's statement was not an act of vouching for Palmer's credibility by implying a knowledge of facts outside of the record or an expression of a personal belief or opinion as to the credibility of Palmer's testimony.

{¶61} Reed argues that this statement was misleading because Palmer would have been subject to perjury charges and retaliation from the Detroit boys, family, and friends. While Palmer would have been subject to a charge of perjury if he had not testified truthfully, he could not have been prosecuted for his involvement in the shooting death of Gucci based on his testimony. The prosecutor's statement was not misleading or improper. The statement was a correct description of Palmer's immune status. *See State v. Tibbetts*, 92 Ohio St.3d 146, 169 (2001) (statements that are a fair commentary on the evidence are not improper). Because the court did not err in allowing the prosecutor's statement, we cannot conclude that there is plain error.

{¶62} As part of his tenth assignment of error, Reed argues that his trial counsel was ineffective for failing to object to the prosecutor's comment quoted above. To prove ineffective assistance of counsel, Reed must establish that (1) his counsel's performance was deficient, and (2) that but for counsel's deficient performance there is a reasonable probability that the result of the trial would have been different. *Strickland*, 466 U.S. at 687. Having concluded above that the prosecutor's statement regarding Palmer's immunity was not improper, Reed cannot establish that his counsel's failure to object constituted a deficient performance.

**{¶63}**  Reed's fifth assignment of error is overruled.  His tenth assignment of error, as it relates to the prosecutor's statement regarding Palmer's immunity, is also overruled.

Assignment of Error Number Six

IT WAS PLAIN ERROR FOR THE COURT TO FAIL, *SUA SPONTE*, TO INSTRUCT THE JURY ON ACCOMPLICE TESTIMONY, IN VIOLATION OF LASHAUN REED'S RIGHT TO A FAIR TRIAL, U.S. CONST., AMEND.V, XIV; OHIO CONST. ART.1, SEC. 10.

**{¶64}**  In his sixth assignment of error, Reed argues that the court erred in failing to give jury instructions in compliance with R.C. 2923.03(D) and 2923.01(H)(2).  We disagree.

**{¶65}**  Because Reed did not object to the jury instructions at trial, we limit our review to plain error.  *See State v. Michel*, 9th Dist. Summit No. 25184, 2011-Ohio-2015, ¶ 22.  Plain error will only be found if it affects a substantial right.  Crim.R. 52.  There are three requirements to finding plain error.  *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 15-16.  First, there must be an error.  *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).  Second, the error must be obvious.  *Id.*  Lastly, the error must have affected the outcome of the trial.  *Id.*  "The plain error rule should be applied with caution and should be invoked only to avoid a clear miscarriage of justice."  (Quotation omitted.)  *State v. Long*, 53 Ohio St.2d 91, 95-96 (1978).

**{¶66}**  R.C. 2923.01(H)(2) provides that:

If a person with whom the defendant allegedly has conspired testifies against the defendant in a case in which the defendant is charged with conspiracy and if the testimony is supported by other evidence, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice that is supported by other evidence does not become inadmissible because of [his] complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect [his] credibility and make [his] testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

This accomplice instruction is virtually identical to R.C. 2923.03(D) for complicity. The threshold question is whether Palmer was an accomplice.

{¶67} The Supreme Court has held that "at the very least, an 'accomplice' must be a person indicted for the crime of complicity." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 131, quoting *State v. Wickline*, 50 Ohio St.3d 114, 118 (1990). However, there could be a rare circumstance where an instruction is required despite the witness not being indicted for the crime of complicity. *See Smith*, 9th Dist. Summit No. 25650, 2012-Ohio-794, ¶ 22, citing *State v. Sillett*, 12th Dist. Butler No. CA2000-10-205, 2002-Ohio-2596, ¶ 19. An example of such a case might be when the accomplice is offered immunity in exchange for testimony and thus may never be indicted for the crime. *Sillett* at ¶ 19.

{¶68} Here, Palmer asserted his Fifth Amendment privilege against self-incrimination while testifying for the State. After consulting with counsel, he was granted transactional immunity and compelled to testify. Palmer explained that while he was legally prohibited from owning a gun, he had an AK-47 and had gone with Reed to a friend's house to retrieve it. Palmer's testimony was that he repeatedly tried to convince Reed not to go looking for Gucci, and told him that if Gucci came to his house he should "handle it [there] * * * because you have * * * rights at your house." Palmer consistently stated that he was trying to prevent Reed from going to Deb Cook's house to confront Gucci.

{¶69} Based on the evidence presented, a reasonable juror could have concluded that Palmer did not aid or abet Reed in committing murder. On the other hand, a reasonable juror could have chosen not to believe Palmer's testimony and concluded that Palmer was acting as an accomplice. To rise to the level of plain error, the error "must be an 'obvious' defect in the trial proceedings." *Barnes*, 94 Ohio St.3d at 27. Because it is debatable whether Palmer's immunity

was the rare circumstance in which an accomplice instruction was needed, we cannot conclude that the trial court's failure to sua sponte give the accomplice instruction amounted to plain error. Reed's sixth assignment of error is overruled.

Assignment of Error Number Seven

THE SENTENCING JUDGE COMMITTED PLAIN ERROR BY IMPROPERLY CONSIDERING LASHAUN REED'S REJECTION OF A PLEA BARGAIN TO BE EVIDENCE OF FAILING TO ACCEPT RESPONSIBILITY, LEADING TO A HARSHER SENTENCE BASED ON THAT CONSIDERATION, IN VIOLATION OF DUE PROCESS, U.S. CONST. AMEND. V, VI, XIV, OHIO CONST.ART. I, SEC. 10; AND THE SENTENCE WAS OTHERWISE UNDULY HARSH.

Assignment of Error Number Ten

THE CONVICTION IS REVERSIBLE ON GROUNDS OF INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶70} In his seventh assignment of error, Reed argues that the court erred in considering his rejection of a plea offer as evidence of failing to accept responsibility. In addition to plain error, Reed, as part of his tenth assignment of error, argues that his trial counsel was ineffective for failing to object to the court's consideration of his rejection of the plea as evidence of his failure to accept responsibility.

{¶71} The court may not punish the defendant for exercising his or her right to a trial. *State v. Collmar*, 9th Dist. Summit No. 26496, 2013-Ohio-1766, ¶ 34. We have recently cited the Seventh District Court of Appeals' succinct explanation of this law.

> A defendant should never be punished for exercising his right to trial or refusing to enter into a plea agreement. *State v. O'Dell,* 45 Ohio St.3d 140 (1989), paragraph two of the syllabus. Such a punishment would impair the constitutional right to a trial by creating a chilling effect upon a defendant's ability to exercise his constitutional right. *State v. Scalf,* 126 Ohio App.3d 614, 621 (8th Dist.1998), quoting *United States v. Stockwell,* 472 F.2d 1186, 1187 (9th Cir.1973). Accordingly, a trial court may not augment a sentence because a defendant chooses to force the government to prove his guilt, "'no matter how

overwhelming the evidence of [defendant's] guilt.'" *Id.* at 620, quoting *United States v. Derrick,* 519 F.2d 1, 3 (6th Cir.1975).

But there are legitimate reasons why a trial court may sentence a defendant more harshly after a trial on the merits than it may have after a guilty plea. First, the United States Supreme Court has recognized the propriety of offering lenient sentences in exchange for a guilty plea. *See Corbitt v. New Jersey,* 439 U.S. 212, 221–224 (1978). It is proper to offer a more lenient sentence in exchange for a guilty plea because a defendant's acknowledgement of guilt has shown a willingness to assume responsibility for this conduct and has taken the first step toward rehabilitation. *Brady v. United States,* 397 U.S. 742, 753 (1970). Second, a trial court knows more details about the facts of the case, the flavor of the event, and its impact upon the victim after a trial on the merits than it would after a guilty plea. *Derrick* at 4. This "more real and accurate appraisal of the circumstances which brought the defendant to the bar of justice" will "almost inevitably * * * affect the judge's consideration of what penalty appears most appropriate." *Id.* Accordingly, the fact that the sentence imposed after trial is greater than the sentence the State offered to recommend in exchange for a guilty plea does not demonstrate that the trial court acted improperly.

*Collmar* at ¶ 34, quoting *State v. Mayle*, 7th Dist. Carroll No. 04 CA 808, 2005-Ohio-1346, ¶ 45-46.

**{¶72}** Reed signed a written rejection of a plea offer. This typed form includes a provision that states: "I understand that my rejection of a plea offer will be considered by the State and may be considered by the [c]ourt to be an unwillingness to accept responsibility for my alleged actions, should I be convicted at trial." Reed argues that this is an impermissible punishment for exercising his constitutional right to a trial.

**{¶73}** While this language does give us pause, the evidence does not support his argument that the court punished Reed for exercising his right to a trial. At the sentencing hearing, the court stated that it "formulated a sentencing decision based upon the overriding principles and purposes of felony sentencing." The court went on to find that there were no mitigating factors in this case. Reed shot Gucci in his back while Gucci was on the ground, an act that "was close to being an execution." Reed ignored his brother and his attempts to prevent

Reed from "engaging in this activity." While awaiting trial, Reed was recorded trying to teach his 3 year old daughter to call Palmer a "snitchin bitch." The court found that the most important factor was Reed's criminal history. Reed had a "litany of offenses and [ ] opportunities * * * to straighten out [his] life." However, Reed had failed to take advantage of any of these opportunities. For these reasons, the court imposed the maximum sentence of life in prison without the possibility of parole. While the court did find that Reed had failed to take responsibility for his actions and placed his brother in a very uncomfortable position of having to testify against him, it made no reference to Reed's rejection of the plea agreement and we decline to read one into the record. Because we conclude the court did not err, we cannot conclude there is plain error.

{¶74} As part of his tenth assignment of error, Reed argues that his trial counsel was ineffective for failing to object to court's consideration of his rejection of the plea offer. Because the court made no reference to Reed's rejection of the plea offer, we cannot conclude that counsel was ineffective for failing to object.

{¶75} Reed's seventh assignment of error is without merit and is overruled. His tenth assignment of error, as it relates to his rejection of the plea offer, is also overruled.

<u>Assignment of Error Number Eight</u>

IT WAS PLAIN ERROR FOR THE TRIAL COURT TO ORDER FIVE YEARS OF MANDATORY POST-RELEASE CONTROL FOR AN UNCLASSIFIED FELONY.

{¶76} In his eighth assignment of error, Reed argues that the court erred when it imposed post-release control. We agree.

{¶77} Post-release control is governed by R.C. 2967.28. The statute does not permit the imposition of post-release control on unclassified felonies. Thus, an individual sentenced for

aggravated murder is not subject to post-release control. *State v. Brown*, 9th Dist. Wayne No. 11CA0054, 2013-Ohio-2945, ¶ 62. "Instead, such a person is either ineligible for parole or becomes eligible for parole after serving a period of 20, 25, or 30 years in prison." *Id.*, quoting *State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, ¶ 36.

{¶78} Here, the trial court erred by informing Reed that post-release control would be part of his sentence. As such, that portion of his sentencing order is void. *See State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, ¶ 26. Reed's eighth assignment of error is sustained, and the matter is remanded to the trial court so that the sentencing entry may be corrected. *See Brown* at ¶ 62.

Assignment of Error Number Nine

IT WAS PLAIN ERROR FOR THE SENTENCING COURT TO EXAMINE A PRE-SENTENCE INVESTIGATION FROM A PREVIOUS CASE PRIOR TO SENTENCING.

{¶79} In his ninth assignment of error, Reed argues that the court erred in considering the presentence investigation report submitted from a prior case.

{¶80} Because Reed did not object to the court's use of the presentence investigation report, his argument is limited to plain error. Under Crim.R. 52, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Plain error is not present unless but for the error complained of, the outcome of the trial would have been different." *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, at ¶ 78.

{¶81} Crim.R. 32.2 provides that "[i]n felony cases the court shall, and in misdemeanor cases the court may, order a presentence investigation and report before imposing community control sanctions or granting probation." Reed requests that we read this rule to say that a

presentence investigation report may not be considered in cases of unclassified felonies because the defendant is not eligible for community control or probation. We decline to read the rule that broadly. Crim.R. 32.2 merely requires a court to order a presentence investigation report before imposing community control or granting probation in felony cases.

{¶82} In death penalty cases, a presentence investigation report must be requested by the defendant. R.C. 2929.03(D)(1). However, this statute only applies to death penalty charges. *See State v. Allard*, 75 Ohio St.3d 482, 489 (1996). Here, Reed was not subject to the death penalty as his indictment did not contain one of the necessary aggravating factors. *See* R.C. 2929.04(A).

{¶83} Reed argues that the statutes and rules must be read to exclude the presentence investigation report because this Court is unable to review the report on appeal. *See* R.C. 2953.08(F). However, the trial court may consider the presentence investigation report for evidence of mitigation. R.C. 2947.06(A)(1). This Court is permitted to review presentence investigation reports prepared pursuant to R.C. 2947.06. R.C. 2953.08(F)(1).

{¶84} At sentencing, the trial court said that it had reviewed Reed's prior presentence investigation report mainly for his background and criminal history, and had provided Reed with a copy of the report. The prosecutor orally detailed Reed's criminal history. The court went on to say that it "tried to review whatever mitigating factors [it] could find," but that it found none whatsoever. Because the court was permitted to consider the presentence investigation report for mitigating factors, we find no error, let alone plain error. *See* R.C. 2947.06(A)(1).

{¶85} Reed's ninth assignment of error is overruled.

<u>Assignment of Error Number Ten</u>

THE CONVICTION IS REVERSIBLE ON GROUNDS OF INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶86} In his tenth assignment of error, Reed argues that his trial counsel was ineffective. Specifically, Reed argues that his counsel was ineffective for: (1) not hiring an expert witness to testify about bullet trajectory and the nature of Gucci's wound; (2) failing to sufficiently establish a timeline through witness testimony; (3) failing to object to hearsay testimony from Detective McCloud; and (4) not requesting common law jury instructions regarding the factors to prior calculation and design.

{¶87} To prove ineffective assistance of counsel, Reed must establish that (1) his counsel's performance was deficient, and (2) that but for counsel's deficient performance there is a reasonable probability that the result of the trial would have been different. *Strickland*, 466 U.S. at 687.

{¶88} As to counsel's failure to hire an expert witness to testify about bullet trajectory and nature of the "long range" gunshot wound. Reed argues that "trajectory evidence alone * * * would negate prior calculation and design." If this is true, it would be appropriate for a petition for post-conviction relief, not a direct appeal. There is absolutely no testimony regarding the bullet trajectory for us to review. "It is impossible for this court to determine on a direct appeal from a conviction whether an attorney was ineffective in his representation of a criminal defendant, where the allegation of ineffectiveness is based on facts dehors the record." *State v. Oliver*, 9th Dist. Summit No. 24500, 2009-Ohio-2680, ¶ 16, quoting *State v. Pitts*, 9th Dist. Summit No. 20976, 2002-Ohio-6291, ¶ 90.

{¶89} Next, Reed argues that his counsel was ineffective for failing to establish a timeline from witness testimony. More specifically, he argues that counsel was ineffective for not introducing into evidence the phone records of Aunt Joan. Again, Reed bases his argument

on evidence outside of the record. Without being able to review such records, we cannot conclude that Reed suffered prejudice.

{¶90} Reed also argues that his trial counsel was ineffective for failing to object to "the hearsay testimony from [Detective] McCloud on T.284, because it undermined [ ] Cook['s] story." Reed does not develop this argument any further. Detective McCloud, on page 284 of the transcript, testified that Cook told him that "Shaun" arrived at her house with "OC." Detective McCloud then explained that OC is Reed's cousin that was living with him at the time. Even assuming that Detective McCloud's statement about what Cook told him was inadmissible hearsay, we cannot conclude that but for counsel's failure to object to this statement he would not have been convicted of aggravated murder and murder.

{¶91} Lastly, Reed argues that his counsel was ineffective for failing to request common law prior calculation and design factors. As discussed in assignment of error number one, there is no bright-line test to determine prior calculation and design, instead each case must be viewed based on its particular facts. *Taylor*, 78 Ohio St.3d at 20-21. Reed cites no legal support for his argument that a jury must be instructed on certain factors they may consider when determining prior calculation and design. We will not develop an argument for him. As this Court has repeatedly held, "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998).

{¶92} Reed's tenth assignment of error is without merit and is overruled.

### III

{¶93} Reed's eighth assignment of error is sustained. His remaining assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed,

except the portion related to post-release control which is reversed.  The matter is remanded to the trial court to remove post-release control from the sentencing entry.

Judgment affirmed in part,<br>
reversed in part,<br>
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

BETH WHITMORE
FOR THE COURT

BELFANCE, P. J.
CONCURS.

CARR, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

CLARKE W. OWENS, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and NATHAN R. SHAKER, Assistant Prosecuting Attorney, for Appellee.